**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**JOSE RAMOS**,

                 Plaintiff,

   -against-

**THE CITY OF NEW YORK, JOHN DOE #1, and JOHN DOE #2**,

             Defendants.

Case No.: 23-cv-1437

**COMPLAINT**

---

Plaintiff JOSE RAMOS, by his attorneys, Rickner PLLC, complaining of the Defendants, alleges, upon information and belief and personal knowledge:

### NATURE OF THE CASE

1. Plaintiff JOSE RAMOS ("Plaintiff" or "Mr. Ramos") brings this action for compensatory and punitive damages pursuant to 42 U.S.C. § 1983 for violations of his federal and state constitutional rights while in the custody of the New York City Department of Corrections at Rikers Island.

### JURISDICTION

2. This action is brought pursuant to 42 U.S.C. § 1983 for violations of Plaintiff's rights under the Fourth, Fifth and Fourteenth Amendments to the Constitution of the United States, Plaintiff's rights under Article 1 of the Constitution of the State of New York, and the common laws of the State and New York.

3. An award of costs and attorneys' fees is authorized pursuant to 42 U.S.C. § 1988.

4. Pursuant to New York State General Municipal Law § 50-e, Plaintiff filed a timely Notice of Claim with the New York City Comptroller, and the Comptroller designated the claim as number 2022PI005383.

5.      Plaintiff appeared for a hearing under New York State General Municipal Law § 50-h on July 28, 2022.

6.      Plaintiff's claims were not adjusted by the New York City Comptroller's Office within the period of time provided by statute.

## JURISDICTION & VENUE

7.      Venue is properly laid in the District Court for the Southern District of New York, because the Plaintiff's claims arose in Bronx County.

## JURY DEMAND

8.      Plaintiff hereby demands a trial by jury.

## PARTIES

9.      Plaintiff is, and was at all times relevant to this action, a resident of Bronx County in the State of New York.

10.      Defendant the City of New York ("the City") is a municipal entity created and authorized under the laws of the State of New York.

11.      It is authorized by law to maintain a municipal jail system and does so through the New York City Department of Correction ("DOC"), which is responsible for the operation and maintenance of the multi-facility complexes located on Riker's Island.

12.  Defendant John Doe #1 (hereinafter "Doe #1") was at all relevant times described herein an employee of the DOC, employed by the City of New York. At all relevant times described herein he was acting under color of New York state law and acting in the course and scope of the duties attendant to that employment. He is sued in an individual capacity.

13.  Defendant John Doe #2 (hereinafter "Doe #2") was at all relevant times described herein an employee of the DOC, employed by the City of New York. At all relevant times

described herein he was acting under color of New York state law and acting in the course and scope of the duties attendant to that employment. He is sued in an individual capacity.

14.    Defendant the City of New York assumes the risks incidental to the maintenance of Rikers Island and the employment of its staff and corrections officers.

## THE VIOLATION OF PLAINTIFF'S CIVIL RIGHTS

### *Claimant's Three Weeks in Intake*

15.    Plaintiff Jose Ramos entered Rikers Island on or about November 3, 2021, where he remained in a make-shift intake area at the Eric M. Taylor Center ("EMTC") in "6 Lower" for approximately three weeks.

16.    During this time, there was human waste on the floors and walls, no access to recreational activities, phones, or programming, access to medical was severely delayed and limited, and multiple staffing posts went unfilled daily.

17.    The lack of staff in the intake area allowed gang members to control it and the distribution of food to the detained population within it, all of whom were crammed into areas meant for significantly fewer people to stay for only 1-2 days, not weeks at a time.

18.    The lack of staff, resources, and gang-controlled chaos spilled over into all aspects of Mr. Ramos' life—Mr. Ramos was regularly without clean clothing, including socks and underwear, forcing him to make do with the clothes on his back, including his personal sneakers and shirt. More still, Mr. Ramos was not given a mattress and had to collect blankets from persons being released from confinement to cover himself in the cold months and create a pallet to lay on. He also had to procure his own toothbrush and other basic hygienic materials from fellow detainees.

### *The November 23, 2021 Incident*

19.    In late November 2021, Mr. Ramos was housed in the "6 Building" on Rikers

Island, where gang members (likely members of the Bloods) had taken control of the housing unit.

20.    These gang members were preventing non-affiliated detainees, like Mr. Ramos, from accessing food deliveries or speaking directly to DOC staff.

21.    The gang members would also intercept both non-affiliated detainees and guards at the entryway to the unit, making clear that they ran the house and that all movement would go through them. DOC staff was well aware of the situation, but failed to intervene in the gang takeover over and did nothing to ensure that non-affiliated detainees were able to access food— the most basic of services the City is required to provide to all persons in its custody.

22.    Several days before Thanksgiving Day, the gang members in Mr. Ramos' housing unit held a "stickup," meaning that they would prevent any food from coming into the dorm until their demands to DOC were met.

23.    Mr. Ramos was not a part of the stickup, but suffered its consequences, nonetheless. He was prevented from using the phones and went without any meals for approximately three days while the gang members controlled the house. The men in control of the unit also fashioned and carried make-shift weapons sharpened from pieces of plexiglass, which they would use to intimidate unaffiliated detainees and harness control over all movement in the house.

24.    On November 23, 2021, after days of preventing the delivery of food to the housing unit, the gang members became angry about the lack of services they were protesting and began rioting.

25.    As the riot began, corrections officers left their posts, leaving the detainees inside at the mercy of the gangs.

26.    The gang members covered surveillance cameras and barricaded the door, causing the Emergency Services Unit ("ESU") to respond to the housing unit.

27.    When ESU arrived, they informed the group that they were going to remove the detainees who were not involved in the riot first, and that those persons should make their way to the front of the house for removal.

28.    In response, Mr. Ramos put his hands up and walked backwards slowly towards the ESU officers. But instead of leading Mr. Ramos away from the dangerous situation, Officer Doe #1 rushed him, forced him to the floor, and put a knee into his back while holding his face to the ground. While incapacitated, the Officer Doe #2 proceeded to spray Mr. Ramos at a close distance with chemical mace, cuffed him with plastic zip ties, and treated him as an instigator to a situation he was attempting to escape.[1]

29.    When Mr. Ramos told the officers they were hurting him, they expressed no concern and instead mocked his presence in Rikers altogether, implying that he should not have been arrested if he wanted to avoid this kind of dehumanizing treatment. The officers yanked Mr. Ramos up by the plastic cuffs and made him sit on his knees against a wall while they continued their rampage against the detained population, beating and spraying everyone indiscriminately.

30.    Mr. Ramos was having trouble breathing and was experiencing pain in his neck, back, and left arm from the violent take down and cuffing. He was eventually taken to a single cell where he begged for medical attention but was ignored. Mr. Ramos was left in the cell overnight before being transferred back to the same dorm with the same gang members from the riot.

31.    It was not until one and a half to two weeks later that Mr. Ramos was moved out of the dorm and called to medical for an assessment of his injuries.

32.    Mr. Ramos continued living in deplorable conditions on Rikers Island until his release on December 31, 2021.

---

[1] There were an unknown number of ESU officers involved in Mr. Ramos' assault. However, there were at least two directly involved, Does #1 and #2.

33.     After his release, Mr. Ramos sought rehabilitative care for these injuries, but remains in pain to this day.

### FIRST CLAIM FOR RELIEF:
### EXCESSIVE FORCE UNDER 42 U.S.C. § 1983
### AGAINST THE INDIVIDUAL DEFENDANTS

34.   Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

35.   Officers Doe #1 and Doe #2 ("the Individual Defendants") used physical force against Plaintiff.

36.   The Individual Defendants' use of force against Plaintiff, when he had his hands up and was clearly in compliance with their orders, was excessive, unlawful, and unconstitutional.

37.   Even assuming arguendo that Plaintiff's assault was lawful, the Individual Defendants engaged in the use of force that was excessive, malicious, gratuitous, and with the intention of inflicting physical and emotional harm to Plaintiff.

38.   That by virtue of the aforementioned acts by the Individual Defendants, Plaintiff was deprived civil rights guaranteed under the Fourth Amendment to the United States Constitution to be free from unreasonable or unlawful seizures, and the Individual Defendants therefore are liable to Plaintiff for damages under 42 U.S.C. § 1983.

39.   As a result of the above unconstitutional conduct, Plaintiff was caused to suffer physical, economic, and emotional injuries.

40.   As a result of the above unconstitutional conduct, the Individual Defendants are liable for punitive damages.

### SECOND CLAIM FOR RELIEF:
### *MONELL* CLAIMS AGAINST THE CITY OF NEW YORK

41.    Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

42.    The City of New York is liable for the conduct of the Department of Corrections and its employees on Rikers Island under *Monell v. Department of Soc. Svcs.*, 436 U.S. 658 (1978).

43.    The City has had de facto policies of understaffing on Rikers Island, failing to hire and train correction officers, failing to properly manage correction officers and staff at Rikers Island, and failing to keep Rikers Island's facilities in proper working order.

44.    The City, including the final policy makers at DOC and the mayor himself, have been aware of problems like those in this Complaint, which have consistently gotten worse since the beginning of the COVID-19 pandemic. Rikers Island continues to deteriorate, and although the final policymakers have known this, they have chosen to do nothing to slow or stop it.

45.    This is not a case where a single incident caused the civil rights violation, although often that is the case. Instead, there are a collection of horrible conditions that have worked in concert to make Rikers Island unbearable, unconstitutional, and inhumane. These conditions, moreover, have not occurred in isolated facilities or at isolated times. The problem is system wide.

46.    In a case challenging numerous conditions of confinement, the Second Circuit made clear that "[e]ach of these conditions must be measured by its severity and duration, not the resulting injury, and none of these conditions is subject to a bright-line durational or severity threshold. Moreover, the conditions must be analyzed in combination, not in isolation, at least where one alleged deprivation has a bearing on another."[2]

47.    The numerous deplorable conditions on Rikers Island add up to create an overall environment that deprives every person incarcerated there of their basic constitutional rights.

---

[2] *Darnell v. Pineiro*, 849 F.3d 17, 32 (2d Cir. 2017).

48.     Through its deliberate indifference to the horrible conditions on Rikers Island and its failure to address numerous problems there despite being aware of them for many years, the City has violated Plaintiff's rights and caused injury.

### A. Conditions are overcrowded, unsanitary, and unhabitable as the physical structures on Rikers Island fall apart.

49.     Overcrowding is rampant in the Rikers jail complex, jail cells are not habitable or sanitary, and infrastructure is falling apart.

50.     In intake, rather than spending a few hours in the small cells where new detained persons are processed, dozens of people are stuffed into small cages for days and weeks at a time. Shockingly, they are expected to defecate and urinate in plastic bags within inches of one another.[3]

51.     The New York Post published images which "show as many as 26 men stuffed body to body in single cells where they were forced to relieve themselves inside plastic bags and take turns sleeping on the fetid floors."[4]

---

[3] *See* Open Letter to New York City District Attorneys (October 5, 2021),
https://secureservercdn.net/50.62.89.79/egs.840.myftpupload.com/wp-content/uploads/2021/10/DA-open-letter-Final.pdf.
[4] *See* Gavrielle Fonrouge, *Photos Inside Rikers Island Expose Hellish, Deadly Conditions*, New York Post (Oct. 21, 2021), https://nypost.com/2021/10/21/photos-inside-rikers-island-expose-hellish-deadly-conditions/.









52.    During a five-day period in mid-September, at least 105 detained persons were inside the crowded cells long after they should have been moved, records show.[5]

53.    In April 2021, a group of detained people was brought to intake where they were forced to stay with 27 other people in a single holding pen for three days. At least six of the detained persons in the cell were throwing up, likely suffering from drug withdrawal, before the detained persons were moved into the permanent housing area.

54.    One of the men, Mr. Thomas Earl Braunson III, who was being held on a minor parole violation, died hours later; his death is currently under investigation. DOC staff did not clean the area in which the man had passed away, despite it being covered in feces and blood. Other detained persons in the unit were forced to clean the mess without any protective equipment.

55.    The Board of Correction's ("BOC") internal investigation of Mr. Braunson's death noted "horrible conditions" in the jail's intake area where the detained persons were held, reporting that the area has "severe staffing shortages and supplies issues . . . [including] missing sheets and blankets," that no one in the entire facility had a pillow, and that the detained persons "were not receiving recreation or meals on a regular schedule."[6]

56.    Some detained persons go two to four weeks without being offered a shower or clean clothing, and others are forced to sleep on the ground, shoulder to shoulder in these cells. Clothing and shoes, such as slippers typically used in the showers, are altogether unavailable, leaving detained persons vulnerable to slip and falls or foot infections from the shared shower spaces and general filth accumulating in the unattended facilities.

57.    Vermin, bugs, and roaches are also widespread throughout Rikers facilities, and

---

[5] *Id.*
[6] *See* NYC BOC Death Reviews: Preliminary Report to Board on the death of Thomas Braunson, prepared by Dep. Gen. Counsel Kate McMahon (Apr. 23, 2021), https://s3.documentcloud.org/ documents/21031127/preliminary-board-report-thomas-braunson_redacted-1.pdf.

have been for years,[7] including in the kitchens, bathrooms, and sleeping areas.

58.    Lawmakers who toured the facility in 2021 reported shower stalls doubling as cells, garbage covering the halls, fecal matter, urine, and dead cockroaches on the floor.[8]

59.    During a visit to Rikers in February 2022, a court-appointed monitoring team "found the conditions at one intake to be particularly distressing—a toilet was overflowing with feces and an individual was sleeping on the floor outside one of the intake pens."[9]

### i.    Lack of Sanitation

60.    Rikers Island is built on an old landfill, creating a number of hazardous environmental conditions from its inception.[10] The City is aware of these unsafe conditions but, with deliberate indifference, has failed to provide proper sanitation on the Island.

61.    In 2001, the District Court for the Southern District of New York issued an order (the "Environmental Order") directing the DOC to take specific actions to remedy violations of federal law in fourteen New York City jails, including those on Rikers Island.[11] The *Benjamin* class action involves years of court-ordered reform and mandatory reporting regarding the progress of the environmental conditions in the City's jails. But over two decades later, conditions have worsened, and the most recent reports from the Office of Compliance Consultants ("OCC") concerning the Environmental Order paint a bleak picture of conditions on the Island.

62.    In a quarterly progress report covering the period between January and April of

---

[7] *See* Sam Ball , "Tales From Inside Rikers, The Notorious NYC Jail Set To Close," France 24, https://www.france24.com/en/20180226-tales-inside-rikers-island-notorious-new-york-jail-prison-close
[8] Graham Rayman and John Annese, "'Horror Island': NYC politicians touring Rikers witness filth, overcrowding and inmate's attempted suicide," New York Daily News (Sept. 13, 2021), https://www.nydailynews.com/new-york/nyc-crime/ny-pols-tour-rikers-island-decry-conditions-20210914-c7tkloonubhmzidc4y3mndbtbq-story.html
[9] *See* Special Report of the *Nunez* Independent Monitor at 23, *Nunez v. City of New York et. al.*, 11-cv-5845 (LTS)(JCF) (S.D.N.Y. Mar. 16, 2022), ECF No. 438.
[10] Ashley Gilbertson, "This is Rikers," The Marshall Project (June 25, 2015), https://www.themarshallproject.org/2015/06/28/this-is-rikers.
[11] *See Benjamin v. Brann*, Case No. 1:75-cv-03073 (LAP) (S.D.N.Y.).

2019, a year before the pandemic hit New York City, 29 housing areas failed their inspections with respect to the management of basic sanitation and housekeeping in the facilities.[12] In 25 percent of those cases, the DOC provided inadequate cleaning equipment, while only 2 percent were found to follow proper cleaning procedures.[13]

63.    During the same four-month period, there were approximately 250 incidents of vermin reported by DOC staff, including the presence of flies, ants, maggots, roaches, mice, and rats in the facilities.[14]

64.    The status report in *Benjamin* covering May–August of the following year, 2020, found that the DOC was still not "in substantial compliance with the Court's sanitation mandates" and that there was "no improvement" concerning sanitation from the prior monitoring period.[15] In nearly every facility that was checked during this period, mildew or pooling water was found on and inside the walls and floors of the bathroom areas.[16]

65.    A year later, the report covering May–August of 2021 stated that there were significant discrepancies between the reporting by the City's agencies and their own observations of the environmental conditions of the City's jails.[17]

66.    The 2021 report also found a "clear decline" in the City's compliance over the course of the prior year.[18] While the report indicated that there was a "widely known" issue of "significant staff shortages," during this period, the City failed to discuss with the monitor what

---

[12] Austin-Best, Nicole N., "Report on Environmental Conditions: January–April 2019," Office of Compliance Consultants, at 5 (June 17, 2019).
[13] *Id.*
[14] *Id.* at 10.
[15] *See* Austin-Best, Nicole N., "Report on Environmental Conditions: May–August 2020," Office of Compliance Consultants, at 4–5 (Oct. 15, 2020).
[16] *Id.* at 20.
[17] *See* Austin-Best, Nicole N., "Report on Environmental Conditions: May–August 2021," Office of Compliance Consultants, at 6 (Oct. 27, 2021).
[18] *Id.* at 6–7.

effect those shortages were having on compliance with the Environmental Order.[19]

| Monitoring Period | January–April 2020 | May–August 2020 | September–December 2020 | January–April 2021 | May–August 2021 |
|---|---|---|---|---|---|
| Number of Inspections | 130 | 168 | 161 | 169 | 141 |
| Compliance Percentage | 62% | 76% | 78% | 69% | 61% |

67.    These reports demonstrate what those housed on Rikers have long reported—conditions are filthy, unsanitary, and uninhabitable. And they are only getting worse.

### ii.    Heat Conditions

68.    Rikers Island was once described by a detainee as smelling like "sewer, mixed with fertilizer, mixed with death," conditions which significantly worsen with extreme temperatures.[20]

69.    Heat waves at Rikers have been especially prevalent in the summer months.[21] In the summer of 2020, at least 89 percent of grievances made to the DOC were related to a lack of operative air conditioning units or fans in the unit and a lack of access to cool showers, all in the midst of record-breaking temperatures.[22]

70.    None of the jail facilities on Rikers Island are fully air conditioned, and six of the ten jails on Rikers Island have no air conditioning.[23] Where air conditioners are present, the units regularly break, turning dorms into sweatboxes within minutes.[24]

71.    The City is aware of the heat conditions on Rikers Island and has the resources to provide temperature control in the facilities but has failed to do so.

---

[19] *Id.* at 7.
[20] *See* Raven Rakia, "A Sinking Jail: The Environmental Disaster That Is Rikers Island," Grist (March 15, 2016), https://grist.org/justice/a-sinking-jail-the-environmental-disaster-that-is-rikers-island/.
[21] Liz Donovan, "As Conditions at Rikers Reach Crisis Levels, Concerns About Heat Persist," CityLimits.org (Sept. 13, 2021), https://citylimits.org/2021/09/13/as-conditions-at-rikers-reach-crisis-levels-concerns-about-heat-persist/
[22] *Id.*
[23] Raven, *supra* n.23.
[24] Donovan, *supra* n.24.

### iii.  Structural and Physical Problems

72.     Structural deterioration is another long-standing issue on the Island, as the City has ceased any meaningful maintenance of the grounds in anticipation of closing Rikers altogether. The Island is filled with decaying and dilapidated structures never meant to provide permanent facilities, including trailers, tents, and the infamous VCBC barge, which was docked for temporary use as an "emergency fix" for the Island in 1992. Almost three decades later, VCBC remains an active housing unit for detained persons.

73.     In 2017, Mayor DeBlasio acknowledged that extensive repairs and renovations the buildings on Rikers Island were necessary, but the administration seemed to focus on closing Rikers rather than improving conditions for those currently housed there.

74.     During the City's most recent hurricane, flooding and old roofing caused the ceiling in one of the dorm areas came crashing down onto the head of a sleeping detainee. Two weeks later, the mess from the collapse remained strewn about the dorm, and the injured detainee had not been seen by the medical staff. Detained persons were told by the few staff members present to stay away from the wreckage but were nonetheless expected to sleep under the collapsing ceiling.

75.     The structural deterioration at Rikers contributes to the physical and mental deterioration of incarcerated people. One detainee attributed numerous suicide attempts to the "complete isolation, extreme temperatures, polluted air, [and] the stink of the landfill" that is the ever-present reality of being incarcerated at Rikers.[25] This physical and mental deterioration is exacerbated by the lack of emergency and preventative care resulting from staffing shortages.

76.     The City's deliberate indifference to structural deterioration has persisted for years, leaving past, present, and future detainees vulnerable to illness, injury, and/or death.

---

[25] Raven, *supra* n.23.

77.     The City's own investigation in 2015 found scores of "'raw materials to fashion weapons,' with buildings full of aging pipes, metal radiators and other items that could be broken, beaten or carved into crude blades." [26] One detainee recently discovered that a metal grate in the wall of his cell was deteriorated so significantly that he was able to easily kick it down, climb out, and stab his neighbor.

78.     Nevertheless, only minimal efforts have been made to repair the Island's structures and create habitable conditions for the detained persons; efforts which have all but disappeared in the wake of the City's plan to close Rikers.

79.     The structural deterioration at Rikers must be analyzed in combination with other conditions. Inoperable air conditioning units, flooding, clogged and broken plumbing, aging materials, air pollution – these structural deficiencies leave detainees vulnerable to physical and mental illness, as well as increased levels of violence.

80.     When people incarcerated at Rikers are forced to remain in these deteriorating conditions and in crowded, unsanitary, uninhabitable cells, the overall environment created results in gross rights violations.

81.     The conditions leave detainees vulnerable to illnesses like COVID-19 and legionnaires disease. Again, these conditions reinforce each other: the crowded and unsanitary conditions lead to rampant illness, left untreated because of staffing shortages and general mismanagement of facilities and services.

82.     Crowded, unsanitary, and uninhabitable conditions are pervasive throughout all facilities and experienced in one form or another by all people incarcerated at Rikers.

---

[26] *Supra* n.14.

### B. Detained persons are denied adequate, sanitary, and regular meals.

83.    On top of living in these overcrowded, filthy conditions, individuals housed on Rikers Island are not receiving their meals on a regular schedule and the City has been deliberately indifferent to this problem even as it continues. The lack of adequate, sanitary, and regular meals is experienced by essentially every person on the Island, regardless of housing placement, as staff absenteeism has hampered the regular preparation and distribution of meals.

84.    When food is finally served, sometimes hours late, it is often cold and unsubstantial. As a result, basic dietary needs are not being met, particularly for those with prescription diets due to underlying medical issues such as diabetes or heart disease.

85.    In crowded intake areas, officers simply throw loaves of bread into the cells, leaving those packed inside to fend for themselves and fight over the limited amount of available food.

86.    The DOC also orders and stocks its meals based on the maximum capacity of a given dorm or housing area. Because entire units are not being utilized due to a lack of available staff, detained persons are being forced into a few dormitories, far beyond capacity, but meals remain limited to the number of persons who *should* be housed in one area.

87.    Incarcerated persons are thus forced to split meals and utilize commissary to meet their necessarily calorie intake, and gangs have taken it upon themselves to distribute food inequitably, leaving some detained persons without anything to eat at all. Even clean water has become a scare resource: "Some of the only water inmates were able to drink came from tiny sinks inside the pens and without cups, detainees used their unwashed hands to scoop up sips, or put their mouths under the faucets."[27]

88.    In some cases, persons on prescription diets have received meals completely

---

[27] *See* Fonrouge, *supra* n.7.

contrary to that prescription, forcing them to choose between not eating or eating something that will likely make them sick, while those without prescription diets may still get sick due to rotting food. And when the DOC's food (or lack thereof) causes such sickness, emergency and preventative medical care is essentially nonexistent.[28]

89.    Because the City has not acted to remedy dysfunction in the DOC's food distribution system, and because the DOC's staffing crisis is far from resolved, essentially every person incarcerated on Rikers has experienced this denial of adequate nutrition and access to sanitary meals, in violation of their constitutional rights and against all basic human decency.

### C. Violence is rampant among both guards and detained persons, and the incarcerated population is constantly under threat of injury or death.

90.    The City has been deliberately indifferent to the culture of violence prevalent on Rikers Island, and the resulting fear that people there experience on a daily basis.

91.    Southern District Court Judge Swain, who oversees the court-ordered monitorship at Rikers, has described Rikers as suffering from "extremely dangerous" conditions "in which every single day people are in danger."[29] A special report filed by the monitoring team in March 2022 described "unacceptable levels of fear of harm" resulting from dysfunctional staff management and deployment practices at the Department of Correction.[30]

92.    The pervasiveness of this violence—which is predicated on a long-standing culture of brutality by DOC staff—means that every person detained on Rikers, even those who have not yet experienced this violence themselves, nonetheless live in constant fear that they may be next.

---

[28] *See* Correctional Health Services, CHS Access Report: November 2021 (February 7, 2022), https://www1.nyc.gov/assets/boc/downloads/pdf/Reports/Correctional-Health-Authority-Reports/CHS-Access-Report-CY21Q4.pdf.

[29] *See* Transcript of Remote Conference at 6:17, *Nunez v. City of New York, et al.*, 11-cv- 5845 (LTS) (S.D.N.Y. Apr. 26, 2022), ECF No. 456.

[30] *See* Special Report of the *Nunez* Independent Monitor at 4, *Nunez v. City of New York et. al.*, 11-cv-5845 (LTS)(JCF) (S.D.N.Y. Mar. 16, 2022), ECF No. 438.

93.    As early as 2014, the U.S. Attorney for the Southern District of New York reported on this "pervasive" and "deep-seated culture of violence" across Rikers Island, noting that "DOC staff routinely utilize[s] force not as a last resort, but instead as a means" of "control" and to "punish disorderly or disrespectful behavior."[31]

94.    In November 2017, the *Nunez* Monitor made similar observations concerning the entrenched culture of "staff actions and behaviors that too often engender, nurture, and encourage confrontation" rather than deescalate and end conflict between incarcerated individuals.[32] The Report attributed this "tendency to engage in [a] pattern of hyper-confrontation" to "unprofessional conduct" driven by the "inexperience of Staff."[33]

95.    A report published by the New York State Commission of Correction in February of 2018 ("COC Report") found that, in 2017, the rate of violence on Rikers was significantly higher than county jails throughout New York State.[34] Despite having less than half the combined population of these county jails, the number of group or gang assaults and assaults among incarcerated individuals on Rikers was more than double than in the county jails, while the number of assaults involving staff was more than <u>ten</u> times higher than the rest of the state.[35]

96.    But despite being "plagued by managerial failures" and "significant structural problems," the COC Report said, the DOC "demonstrated both an unwillingness and inability to take necessary actions to remedy identified violations [] concerning facility safety and security."[36]

97.    The problem only worsened the following year. In 2018, the New York City

---

[31] *Id.* at 3.
[32] *See* Fourth Report of the *Nunez* Independent Monitor at *10, *Nunez v. City of New York et. al.*, 11-cv-5845 (LTS)(JCF) (S.D.N.Y. Oct. 10, 2017), ECF No. 305.
[33] *See Id.* at *11.
[34] New York State Commission of Correction, *The Worst Offenders Report: The Most Problematic Local Correctional Facilities of New York State* (Feb. 2018), https://scoc.ny.gov/pdfdocs/Problematic-Jails-Report-2-2018.pdf.
[35] *Id.* at 29-30.
[36] *Id.* at 3.

Comptroller's Office found that, despite a declining detainee population, rates of violent incidents and uses of force continued to increase.[37] There were approximately 1,354 fights or assaults per 1,000 average daily population in 2018, compared with only 441 ten years earlier in 2008.[38]

98.    Then-Comptroller Stringer stated in a press release that "the DOC is spending more money with more staff to guard fewer people, yet rates of violence and assault continue to rise which is troubling both for our detained population and for correction officers."[39]

99.    By 2019, use of force by DOC officers had jumped nearly 30 percent from 2018, up to 6,670 from 5,175 in 2018.[40] Violence among incarcerated people also skyrocketed, from 55.8 incidents for every 1,000 people in 2018, to 69.5 in 2019, a 24.5 percent increase.[41]  The rate of serious injury to individuals at Rikers as a result of violent incidents rose nearly 24 percent.[42]

100.    In 2020, uses of force by guards against detained persons rose 183 percent from 2016.[43] More than half of these incidents were found to be avoidable or problematic, and around 30 percent were determined to be excessive or violative of the DOC's use of force policies.[44]

101.    Requests for basic services by detained persons are often met with brutality, as staff increasingly over relies on specialized teams such as the ESU—an enforcement unit well-known to respond to the population indiscriminately with punitive and dangerous tactics.[45]

---

[37] *See* NYC Comptroller, Press Release, *Despite a Decline in Incarceration, Correction Spending, Violence, and Use of Force Continued to Rise in FY 2018* (Jan. 22, 2019), https://comptroller.nyc.gov/newsroom/comptroller-stringer-despite-a-decline-in-incarceration-correction-spending-violence-and-use-of-force-continued-to-rise-in-fy-2018/.
[38] *See Id.*
[39] *See Id.*
[40] Erin Durkin, *New Stats Show Surge in Violence at Rikers Island*, Politico (Sept. 17, 2019), https://www.politico.com/states/new-york/albany/story/2019/09/17/new-stats-show-surge-in-violence-at-rikers-island-1193798.
[41] *See id*; *see also* Julia Marsh, *Violence Spikes at Rikers Island Despite Jail Population Decline*, N.Y. Post (Sept. 17, 2019), https://nypost.com/2019/09/17/violence-spikes-at-rikers-island-despite-jail-population-decline/.
[42] *See Id.*
[43] *See* Eleventh Report of the *Nunez* Independent Monitor at *26, *Nunez v. City of New York et. al.*, 11-cv-5845 (LTS)(JCF) at *26 (S.D.N.Y. May 11, 2021), ECF No. 368.
[44] *See Id.* at *27.
[45] *See Id.* at *50-51 (S.D.N.Y. May 11, 2021).

102.    For example, in the early months of a pandemic, a group of detained persons voiced frustration with new isolation and lockdown protocols related to social distancing. In response to these vocal complaints, an ESU team lined the men up, searched them, and told them to return to their cells. For no clear reason, ESU proceeded to violently attack one detainee, knocking his tooth out as they slammed him to the floor and sprayed him in the eyes with a chemical agent. They then placed a hood over his head and over-tightened restraints around his wrists before leaving him left bloodied in a cell, with the hood and restraints still on. The officers went on to fabricate a report claiming that the man instigated the assault.

103.    In 2021, the rate at which guards used force against detained persons was 200 percent higher than the rate in 2016 that gave rise to the *Nunez* consent decree.[46] There were a total of 419 slashings and stabbings on the Island that year, up 1,097 percent from 2011, despite a steadily declining incarcerated population.[47]

104.    The year of 2021 also saw a 22.5 percent increase from the prior year in violent incidents among individuals in custody.[48] More than 1,900 detained persons suffered lacerations, concussions, or broken bones, and at least 450 of those were so severely injured that they were hospitalized.[49] Given the pervasive failures of DOC staff to take injured people for prompt (or any) medical treatment, the actual rate of hospitalizations is likely much higher, evidencing the City's *de facto* policy of underreporting serious injuries.[50]

---

[46] *See* Special Report of the *Nunez* Independent Monitor at *17, *Nunez v. City of New York et. al.*, 11-cv-5845 (LTS)(JCF) (S.D.N.Y. Mar. 16, 2022), ECF No. 438.
[47] https://nypost.com/2022/05/14/rikers-island-sees-surge-of-stabbings-and-slashings/ (citing figures shared during a public DOC meeting).
[48] https://www1.nyc.gov/assets/operations/downloads/pdf/mmr2021/2021_mmr.pdf.
[49] Jan Ransom and William K. Rashbaum, *How Brutal Beatings on Rikers Island Were Hidden from Public View*, N.Y. Times (March 2, 2022), https://www.nytimes.com/2022/03/02/nyregion/nyc-jail-beating-rikers.html.
[50] NYC Board of Correction, *Serious Injury Reports in NYC Jails January 2019*, (last visited June 24, 2022), https://www1.nyc.gov/assets/boc/downloads/pdf/Reports/BOC-Reports/2019.01.07%20-%20BOC%20Serious%20Injury%20Report%20-%20Final.pdf.

105.    On September 28, 2021, Governor Hochul issued an Executive Order declaring that Rikers Island was in a state of emergency because "conditions in the facilities have led to an unsafe, life-threatening environment for both the inmates and the staff."[51] Nine subsequent Executive Orders extended the State of Emergency, which remains in place today.[52]

106.    By the end of April 2022, a shocking 191 stabbing incidents had already occurred on the Island, putting that number on track to reach 575 total stabbings over the course of the year, a 37 percent increase from 2021.[53]

107.    Comparatively, the rate of staff assaults and fights in DOC facilities is seven to eight times higher on the Island than in the rest of New York State or Los Angeles County,[54] and the *Nunez* monitoring team has taken pains to "emphasize that these high rates [of violence] are *not* typical, they are *not* expected, they are *not* normal" (emphases in original).[55] The Monitor has insisted that these numbers are "abnormal" and "in no way conform to generally accepted practices in the [corrections] field."[56] The sheer number of these incidents, the Monitor opined, should "catalyze an urgency that befits the gravity of the situation."[57]

108.    Moreover, the severity of violent incidents on the Island are frequently downplayed and misrepresented in official DOC reports, creating an inaccurate record of the actual prevalence of injuries and staff assaults on Rikers, and preventing oversight agencies or the federal monitor from accurately assessing the pervasiveness of violence on the Island.

---

[51] N.Y. Exec. Order No. 5, https://www.governor.ny.gov/executive-order/no-5-declaration-disaster-emergency-counties-bronx-kings-new-york-richmond-and.
[52] N.Y. Exec. Order No. 5.9, https://www.governor.ny.gov/sites/default/files/2022-06/EO_5.9.pdf.
[53] Griffin Kelly, *Stabbings and slashings surge on Rikers Island*, N.Y. Post (last updated on May 14, 2022), https://nypost.com/2022/05/14/rikers-island-sees-surge-of-stabbings-and-slashings/ (referencing statement from Board of Correction member).
[54] *See* Special Report of the *Nunez* Independent Monitor, *Nunez*, 11-cv-5845, ECF No. 438 at *4 (S.D.N.Y. Mar. 16, 2022).
[55] *See Id.* at *17 (S.D.N.Y. Mar. 16, 2022).
[56] *See Id.* at 18.
[57] *See Id.*

109.    For example, in August of 2021, a man in intake was beaten so badly by another detainee that he was paralyzed from the neck down, but no report of the incident was ever filed.[58]

110.    In December 2021, a 25-year-old man was slammed to the floor and kicked in the head by another incarcerated person, causing him to spend six weeks in a coma and relearn how to walk and talk. The report of his injury stated that he had suffered from a fractured eye socket and swelling of the head and had not required hospitalization.[59]

111.    In April 2022, a 47-year-old man got into a fight with a detainee and suffered a head injury so severe that he had to undergo emergency surgery and is now partially paralyzed, while DOC records say he suffered only a laceration on the left side of his head.[60]

112.    Common security breaches include failing to secure doors, failing to supervise detained persons, allowing detained persons to congregate, going off-post, using restraints improperly, or failing to intervene in escalating tensions.[61]

113.    In one case, a detainee passed through an unsecured door and thew scalding water on another individual, causing second-degree burns. The *Nunez* Monitor, in a report from August 24, 2021, found that this incident was "predicated on multiple security breaches."[62]

114.    In January 2022, the DOC reported at least forty incidents where detained persons left their cells or housing units without authorization, and approximately sixty cases of security breaches resulted in incidents of force and violence among detained persons.[63]

---

[58] *See* Jan Ransom and William K. Rashbaum, *How Brutal Beatings on Rikers Island Were Hidden from Public View*, N.Y. Times (Mar. 2, 2022), https://www.nytimes.com/2022/03/02/nyregion/nyc-jail-beating-rikers.html.
[59] *See Id.*
[60] *See* Jan Ransom, *As Pressure Builds Over Rikers Crisis, a Drumbeat of Death and Disorder*, N.Y. Times (May 23, 2022), https://www.nytimes.com/2022/05/23/nyregion/rikers-island-death-crisis.html.
[61] Letter to Court Regarding Present Conditions, *Nunez*, No. 11 cv 5845 at ECF No. 378 at 2 (S.D.N.Y. Aug. 24, 2021).
[62] *See Id.*
[63] *See* Special Report of the *Nunez* Independent Monitor, *Nunez*, No. 11-cv-5845 at ECF No. 438 at *18-19 (S.D.N.Y. Mar. 16, 2022).

115.    Moreover, when the disciplinary records of correction officers were finally made public with the repeal of Section 50-a of New York's civil rights statute in 2021, the data supported what detained persons on the Island have been reporting for years—that they are brutalized and then punished to cover up the officers' misconduct.

116.    Over a twenty-month period, more than half of the uses of force reported by DOC staff included false and misleading statements, omissions, and outright lies about the circumstances surrounding the incident. When confronted with these facts, the DOC did not discipline or otherwise punish the officers for these lies; instead, they implemented a course to "improve their writing skills and to teach them how to complete official incident reports."[64]

117.    While detained persons are often punished after they are victimized by guards, correction officers are rarely held accountable for excessive uses of force or other misconduct. And the City has a substantial backlog of disciplinary actions pending against its officers, which can take over a year from the time of the incident to resolve.[65]

118.    In fact, at a public hearing on April 26 of this year, Commissioner Molina conceded that a "timely and meaningful discipline process . . . quite frankly has never existed in this department," demonstrating how mismanagement and poor oversight, including a lack of discipline, contributes to rampant and increasingly dangerous violence on the Island. [66]

119.    One report found that the City's inability to manage large numbers of staff productively has a direct impact on the ability to effectively reduce levels of violence and ensure

---

[64] *See* Jan Ransom, *In N.Y.C. Jail System, Guards Often Lie About Excessive Force*, N.Y. Times (published Apr. 24, 2021, updated Sept. 22, 2021), https://www.nytimes.com/2021/04/24/nyregion/rikers-guards-lie-nyc-jails.html#:~:text=In%20N.Y.C.-Jail%20System%2C%20Guards%20Oftens%20Lie%20About%20Excessive%20Force,filed%20incomplete%20or%20inaccurate%20reports..

[65] *See* Eleventh Report of the *Nunez* Independent Monitor, *Nunez*, No. 11-cv-5845 at ECF No. 368 at *14 (S.D.N.Y. May 11, 2021).

[66] *See* Transcript of Remote Conference, *Nunez*, No. 11-cv- 5845 at 27:16 (Apr. 26, 2022).

safety. *Nunez* Monitor Steve J. Martin stated that the "state of seriously compromised safety has spiraled to a point at which, on a daily basis, there is a manifest risk of serious harm to both detainees and staff, which in turn generates high levels of fear among both groups."[67]

120.    This universal and reasonable fear is fueled by this pervasive violence as well as every other issue identified in this complaint—from the deteriorating physical conditions of the facilities to the lack of emergency and medical care. Under the law, the City must provide essential services and protect those within their custody. But in reality, those detained are Rikers are forced to fend for themselves.

### D. Gang control within Rikers has been allowed to pervade all aspects of the lives of detainees.

121.    In some intake and housing areas, where no guards are to be found, gang rule has slowly taken over, leaving detained persons vulnerable to yet another means of violence.

122.    In 2014, the DeBlasio administration, under mounting pressure to decrease the violence by guards and inmates within Rikers, discontinued DOC's rotation policy, whereby incarcerated individuals were re-housed regularly in an effort to prevent detainees from banding together.[68] Where the rotation policy meant rival gang members would be housed together, the new policy has wardens placing members of the same gang within the same housing unit, under the mistaken rationale that violence would decrease.[69]

123.    The reality is that these housing units are now "owned" by certain gangs, allowing gang members to take advantage of guard shortages to control every aspect of life within the unit: Incarcerated persons are manning the guards' stations, answering phones, and determining who

---

[67] *See* Letter on Present Conditions, *Nunez*, No. 11 cv 5845 at ECF 378 at *4 (S.D.N.Y. Aug. 24, 2021).
[68] Jan Ransom & Bianca Pallaro, "Behind the Violence at Rikers, Decades of Mismanagement and Dysfunction," The New York Times (Dec. 31, 2021), https://www.nytimes.com/2021/12/31/nyregion/rikers-island-correction-officers.html
[69] *Id.*

can enter and exit certain areas, while guards are utilizing mace indiscriminately and giving detained persons make-shift weapons, instigating violence and further contributing to disorder. With no guards to be found, detained persons are left vulnerable to gang violence.

124.    In some of these units, guards have turned a blind eye to "fight nights" where detained persons are pitted against each other by gang members, and guards watch them fight. Civilian employees report watching as uniformed staff stand by and merely observe the chaos, either out of sheer fear of intervening or callousness toward the state of affairs. Other times, staff gratuitously and indiscriminately uses pepper spray as a shortcut for breaking up disputes.[70]

125.    Non-affiliated detainees who are targeted by a gang and assaulted are often placed by DOC back into the very housing unit where they were beaten, allowing for the abuse to continue. In other cases, where a former gang member is being placed at Rikers, guards will knowingly place the individual in a housing unit run by their former gang, regardless of the obvious risk for retaliation and/or violence.[71]

126.    These conditions have led to a reasonable, universal fear amongst the incarcerated population that they are under a real and constant threat of violence, whether it be excessive force by guards or violence at the hands of their fellow detained persons. This fear is exacerbated by the fact that DOC staff is unlikely to intervene in violent encounters, and that injured persons will not be afforded a timely, adequate medical response if they become the victim of such violence.

**E.  Emergency and preventative medical and mental health care is unavailable.**

127.    A pervasive fear of violence among detained persons is exacerbated by the DOC's proven failure to adequately respond to injuries that result from violent encounters. In a letter dated

---

[70] Jan Ransom, "A Look Inside Rikers: 'Fight Night' and Gang Rule, Captured on Video," The New York Times (Jan. 12, 2022), https://www.nytimes.com/2022/01/12/nyregion/rikers-jail-videos.html.
[71] *Id.*

September 10, 2021, Dr. Ross MacDonald, the Chief Medical Officer of Correctional Health Services ("CHS"), stated that the "[u]navailability of staff has resulted in delays in transferring patients to clinics for care, to mental health units, or to the hospital, even when 911 has been activated and EMS has arrived to transport them."[72] As a result, tasks like distributing medication and transferring patients to clinics for care have fallen to the wayside.[73]

128.    Limitations on accessing mental and medical healthcare begin at intake: when a detained person is brought to Rikers Island, days may pass until they are given a preliminary medical screening, which should occur promptly upon their arrival. During that time, individuals are frequently deprived of medications that they require for the treatment of ongoing conditions.

129.    In 2022 alone, nine people have died in custody on Rikers Island.[74] In 2021, that number was sixteen.[75] Dr. MacDonald attributed the deaths to a collapse in basic jail operations, including the delays in medical care, which he said were caused by the unavailability of correction officers.[76]

130.    Jeanette Merrill, a spokesperson for CHS, has also expressed that "[t]he department's staffing shortages are affecting health operations, including the availability of escorts to bring patients to the clinic and of DOC personnel to staff the clinics."[77]

131.    A Board of Corrections report into the DOC's responsibility for the death of persons

---

[72] Ross MacDonald, M.D. Letter to Keith Powers (Sept. 10, 2021), https://www.ny1.com/content/dam/News/static/nyc/pdfs/RM-city-council-letter-9-10-21.pdf.
[73] *Id.*
[74] *See* Jonah E. Bromwich and Jan Ransom, *3 N.Y.C. Detainees Die in Less Than a Week, Bringing Year's Total to 9*, N.Y. Times (June 22, 2022), https://www.nytimes.com/2022/06/22/nyregion/rikers-inmate-deaths.html.
[75] *See* Michael Wilson and Chelsea Marcius, *16 Men Died in New York City Jails Last Year. Who Were They?*, N.Y. Times (published Jan. 28, 2022, updated Jan. 31, 2022), https://www.nytimes.com/2022/01/28/nyregion/rikers-island-prisoner-deaths.html#:~:text=At%20least%2016%20people%20died,mainland%20by%20the%20East%20River.
[76] *See* Gloria Pazmino, *Rikers Island Detainees Expose Lack of Medical Care While in Custody*, NY1 (Sep. 21, 2021), https://www.ny1.com/nyc/all-boroughs/public-safety/2021/09/22/rikers-island-detainees-expose-lack-of-medical-care-while-in-custody.
[77] *Supra* n.34.

in their custody found similar deficiencies in access to emergency medical care: "<u>DOC and CHS do not seem to have an acceptably functioning system for providing emergency care to persons in life-threatening situations.</u>"[78] (emphasis added).

132.    The report identified significant delays in responsive emergency care for persons experiencing fatal medical emergencies.[79] In two cases, only one officer was stationed in the control unit bubble, despite DOC policy requiring two officers.[80] And in at least three cases resulting in death, detained persons were the first to provide aid and notify DOC staff of the medical emergencies.[81]

133.    According to former Commissioner Schiraldi, inadequate staff is the sole reason for missed medical appointments.[82] New York City Comptroller Brad Lander also told the City Council that when he toured DOC facilities in September 2021, medical providers told him they were not seeing 90 percent of the people on their call list each day.[83]

134.    The DOC does not even deny they lack the manpower necessary to provide constitutionally adequate medical care. In a filing in *Agnew, et al. v. New York City Department of Correction*, Index No. 813431/2021E, the DOC admitted that:

135.    Respondent [the DOC] does not dispute the applicability of the mandates and has freely acknowledged deficiencies in its ability to escort individuals in custody to clinic appointments, primarily due to lack of staff in the jails. … There is no real dispute between the

---

[78] City of New York Board of Corrections, *February & March 2022 Deaths in DOC Custody Report and Recommendations* 7 (May 9, 2022), available at https://www1.nyc.gov/assets/boc/downloads/pdf/Reports /BOC-Reports/deaths-report-and-chs-response-202202-202203.pdf (emphasis added).
[79] See *Id.*
[80] *See Id.* at 6.
[81] See *Id.*
[82] *Id.* at 98:10–12.
[83] *See* Transcript of New York City Council Hearing of September 15 at 86:20–21, available at https://legistar.council.nyc.gov/LegislationDetail.aspx?ID=5117031&GUID=C0114C55-A2DB-430F-84B3-3A451359F9AF&Options=&Search=.

parties as to the following facts: DOC is required to provide access to medical care for individuals in its custody, and the inability to consistently do so is due to serious staff shortages related to the pandemic.

136.    The City's deliberate indifference to these issues has interfered with timely and adequate medical care for years. In November 2018, 21 percent of incarcerated people who needed specialty medical services were not produced to on-Island specialty clinics.[84] That number increased to 30–33 percent in November 2019 and 2020[85][86], and leapt to a shocking 53 percent in November 2021.[87] Medical care is even denied by staff as a form of punishment, or because gang members, who have taken control in the jails,[88] obstruct access for persons seeking care.[89]

137.    On May 13, 2022, Bronx Supreme Court Judge Taylor found the DOC in contempt of a December 2021 court order directing the DOC to provide access to sick call and not prohibit or delay access to health services.[90] But that December, 1,061 medical appointments were missed because of a lack of officer escorts.

138.    One detainee was forced to wait over two months before receiving medical attention for scabies—an itchy condition caused by mites that is very easy to transfer to other people—despite repeated requests to see a doctor for weeks. Another man was made to wait for

---

[84] *See* Correctional Health Services, CHS Access Report: November 2018 (January 29, 2019), https://www1.nyc.gov/assets/boc/downloads/pdf/Reports/CHS_Access_Report_Nov_2018_v2.pdf.
[85] *See* Correctional Health Services, CHS Access Report: November 2019 (February 25, 2020), https://www1.nyc.gov/assets/boc/downloads/pdf/Reports/BOC-Reports/chs-access-report-q4cy19.pdf.
[86] *See* Correctional Health Services, CHS Access Report: November 2020 (August 31, 2021), https://www1.nyc.gov/assets/boc/downloads/pdf/Reports/chs-access-report-cy20q4.pdf.
[87] *See* Correctional Health Services, CHS Access Report: November 2021 (February 7, 2022), https://www1.nyc.gov/assets/boc/downloads/pdf/Reports/Correctional-Health-Authority-Reports/CHS-Access-Report-CY21Q4.pdf.
[88] Ransom, Jan, "A Look Inside Rikers: 'Fight Night' and Gang Rule, Captured on Video," The New York Times (January 12, 2022), https://www.nytimes.com/2022/01/12/nyregion/rikers-jail-videos.html
[89] Ransom, Jan, "Judge Faults Medical Care for Detainees in Latest Sign of Rikers Crisis," The New York Times (May 17, 2022), https://www.nytimes.com/2022/05/17/nyregion/nyc-correction-department-rikers.html.
[90] *See Agnew et al v. New York City Dep't of Corr.*, Index No. 813431/2021E (Sup. Ct. Bronx Co. 2021), NYSCEF Dkt. No. 126.

six weeks for treatment after his fingers were badly jammed; by the time he was seen by the medical staff, his fingers were permanently twisted.[91] These significant delays functionally amount to a complete denial of emergency medical care.

139.    These problems are exacerbated by the virulent Delta variant of COVID-19, whose spread throughout the jail has been enabled by overcrowding in holding cells. As of September 2021, Covid-19 rates outpaced the spread of the disease in the rest of the city. People experiencing flu-like symptoms typically must wait up to a week to be seen by a doctor—too long to isolate cases and staunch the spread of the virus. One person who died in custody contracted Covid-19 in a crowded intake cell where he was held for ten days after his arrest.[92]

140.    Productions to mental health appointments are similarly dismal. Between November 2018 and November 2021, 19 to 35 percent of mental health appointments were missed because staff failed to produce detained persons to their mental health services.[93] George Anderson, a mental health administrator for CHS, said that "with such long wait times for medical care—sometimes weeks, where it was once days—there is now greater incentive for detained persons to self-harm in order to be seen."[94]

141.    Self-harm in the city's jails is, in fact, on the rise. In March of 2021, "148 people harmed themselves, including 12 seriously."[95] Despite this, the small group of staffers available is not properly trained in suicide prevention.[96]

---

[91] *See* Sherman, Rachel, "Rikers Staffing Crisis Limits Access to Medical Care," The City (Aug. 26, 2021), available at https://www.thecity.nyc/health/2021/8/26/22643199/rikers-staffing-crisis-medical-care.

[92] *See* Gloria Pazmino, "Rikers Island Detainees Expose Lack of Medical Care While in Custody," NY1 (Sep. 21, 2021), https://www.ny1.com/nyc/all-boroughs/public-safety/2021/09/22/rikers-island-detainees-expose-lack-of-medical-care-while-in-custody.

[93] *See* nn. 46-49, *supra*.

[94] *Id.*

[95] *See* Jan Ransom, "Disorder and Chaos in N.Y.C. Jails as Pandemic Recedes," The New York Times (Pub. June 19, 2021, Updated Oct. 18, 2021), https://www.nytimes.com/2021 /06/19/nyregion/rikers-island-chaos-suicides.html.

[96] *Id.*

142.    Because of the severe absenteeism, officers are not around to prevent incarcerated individuals from self-harming, oftentimes finding someone well after they are severely injured or have died.[97] Other times, the few officers who are available are in the midst of triple shifts, raising questions about their ability and capacity to properly surveil at-risk populations or intervene in mental health crises.[98]

143.    Since December 2020, at least seven people detained in the DOC's custody have committed suicide, including Brandon Rodriguez; Segundo Guallpa; Wilson Diaz Guzman; Tomas Carlo-Camacho; Javier Velasco; Anthony Scott, and Dashawn Carter.

144.    The unavailability of emergency and preventative care, as well as these increased incidents of self-harm and suicide are emblematic of the larger problem all detained persons on Rikers Island experience: Constant stress and fear that takes a significant toll on incarcerated peoples' mental and physical health, grinding away their will to live. Those detained know that, if they are attacked or become ill, or need assistance with an ongoing condition or acute crisis, they are unlikely to receive the help that they need.

145.    At the same time, the City's unmanageable staffing practices and continued indifference have severely limited access to necessary services known to improve overall wellbeing, including counseling, education, recreation, programming, and religious services. In sum, "[e]very person they send to jail is at great risk of harm or death."[99]

**F.  Recreation and programming, including access to religious programming, has ceased altogether.**

146.    People detained at Rikers are locked in cells or housing units for hours—or even

---

[97] *Id.* (providing various instances in which inmates were found hanging in their cells, including one inmate who had been left hanging for 15 minutes).

[98] *See* Jonah E. Bromwich and Jan Ransom, *An 'Absolute Emergency' at Rikers Island as Violence Increases*, The New York Times (Oct. 11, 2021), https://www.nytimes.com/2021 /08/24/nyregion/rikers-island-emergency-chaos.html.

[99] *Id.*

days—without access to the outdoors or other forms of recreation time. Entire housing units have been shut down, causing "people in custody [to go] weeks or even months without leaving their housing units."[100] Other essential services and programming, including religious observance, have all but come to a standstill.

147.    These stretches of time without recreation and sunlight affect the mental health of those that are isolated, forcing them to undergo a "torturous experience" beyond that of constitutional detention.[101]

148.    Detained persons, whether pre- or post-trial, retain a constitutional right to certain basic services, such as adequate education, skills programming, religious services, recreation outside of their cells, and daily access to the outdoors.

149.    Nearly 50 years ago, the Second Circuit ruled that the City's attempts to limit access to recreation in its jails was unconstitutional. *See Rhem v. Malcolm*, 507 F.2d 333, 339 (2d Cir. 1974). Thus, City and DOC have long known that keeping detained people indoors, without the ability to exercise outside, is illegal.

150.    And yet, for years, DOC has fallen short of its responsibility to provide adequate recreation and programming to those housed at Rikers. When Mayor de Blasio took office, individuals detained in city jails had access to less than one hour per day of programming.[102]

151.    Despite Mayor de Blasio's promise that the City would work on increased

---

[100] Jake Offenhartz, "*People Need To Go Outside": Rikers Detainees Say Loss Of Rec Time Is Intensifying Jails Crisis*, Gothamist (Dec. 13, 2021), https://gothamist.com/news/people-need-to-go-outside-rikers-detainees-say-loss-of-rec-time-is-intensifying-jails-crisis.

[101] Jake Offenhartz, "*People Need To Go Outside": Rikers Detainees Say Loss Of Rec Time Is Intensifying Jails Crisis*, Gothamist (Dec. 13, 2021), https://gothamist.com/news/people-need-to-go-outside-rikers-detainees-say-loss-of-rec-time-is-intensifying-jails-crisis."'When you're able to get outside and look at the sky, maybe see the sun, maybe feel the breeze, it makes you feel like okay . . . Being locked in 24/7, you don't get those thoughts or feelings. You can't have those dreams. It takes everything away from you.'" *Id.* (quoting an activist who was previously incarcerated on Riker's Island).

[102] *See* New York City Office of the Mayor, "A Roadmap to Closing Rikers Island" (June 2017), https://s3.documentcloud.org/documents/3871392/De-Blasio-s-Plan-to-Close-Rikers-Island.pdf.

recreation and programming, detained persons on the Island are not receiving adequate (if any) of these services, despite constitutional and statutory mandates requiring them.

152.    In May 2021, BOC Chair Jennifer Jones Austin relayed the Board's observations that recreation, programming, and other services were unavailable due to staffing problems:

153.    Board members and board staff have observed people spending significant lengths of time in intake. We've also monitored housing areas in the jails and have seen that they are being locked down due to insufficient staffing. A lockdown impacts nearly all of the minimum standards, including access to medical and mental health, time out of cell, recreation, visiting, televisiting, phone calls, showers, and more. We also understand that even when a jail is not locked down, critical services such as recreation, law library, grievance, and more are limited by the acute staffing shortage.[103]

154.    In a recent class action lawsuit challenging human rights violations at the George R. Vierno Correctional Facility ("GRVC")  on Rikers Island, the City admitted that "DOC staffing challenges have disrupted the timely provision of [showers, recreation, and 'lock out' times]" and, as a result, incarcerated persons were "provided the opportunity to shower only approximately once a week, have had limited recreational opportunities, and have had periods of time where they have not been able to leave their cells."[104]

155.    Furthermore, staff and outside contractors who lead skills, art, education, and other classes are no longer coming to the Island because of the inhumane conditions and chaos.

---

[103] New York City Board of Correction Public Meeting (May 11, 2021),
https://www.youtube.com/watch?t=6228&v=DM4Q92NWz7w&feature=youtu.be
[104] *See* Mem. of Law in Opp. to Pls.' Second Motion for a Temp. Restraining Order and Prelim. Inj. at 13, *Arce et al. v. City of New York*, Index No. 809252/2021E (N.Y. Sup. Ct. Sept. 7, 2021), No. 54.

### G.  Access to the courts is severely limited and detained persons are missing court dates and are denied legal calls.

156.    In certain circumstances, bail is set on individuals accused of crimes to "to secure [there] court attendance." Criminal Procedure Law §510.30(2)(a). Often referred to as pre-trial detainees, these persons are presumed innocent, and must attend court in order to defend themselves against pending charges.

157.    But the DOC is not reliably transporting persons in their custody to their scheduled court appearances, in violation of their right to access the courts. Over the course of the last year and a half, detained persons who have already been held for extensive periods of time due to COVID-related court closures are subjected to even longer waiting periods because DOC staff is failing to escort them to their virtual and in person court appearances.

158.    According to a Bronx Defenders Services report analyzing data from November 2021, people on Rikers Island were twice as likely to miss a court date than people who were released on their own recognizance or out on bail. Being denied bail actually doubled the chance of appearing in court, despite the fact that missing court is one of the primary reasons people are given bail in the first place.

159.    One man, Esias Johnson, who was held on the Island on a $1 bail for misdemeanor offenses, missed three court dates because no one was available to transfer him. The DOC's failure to facilitate Johnson's court appearances caused him to languish on the Island far longer than he should have. He died in September after missing his August 20 court appearance.

160.    The Bronx District Attorney recently noted a severe drop off in detained persons who were indicted on charges timely appearing for their arraignments, worsening an already back-logged court docket that is struggling to catch up from months-long closures.

161.    For example, in Queens, only 34 out of 52 people with scheduled court proceedings

on one September day 2021 made it to the borough's criminal court.[105]

162.     Persons awaiting trial also have a Sixth Amendment right to an unimpeded criminal defense, including regular contact with their attorney(s). Those who have been convicted, but remain on the Island, also retain a constitutional right to access the courts, including uninterrupted access to legal mail and calls, as well as access to a law library.

163.     But legal calls and visits are also unavailable or severely limited. Attorneys cannot get ahold of staff to set up visits or calls, or when they do call at a scheduled time, attorneys are met with unanswered phones, or told that their client was not brought down to the legal call area. Often, staff wrongly reports that the client "refused" the call, when, in actuality, they were never even informed that a call with their attorney was scheduled.

164.     Law offices have been inundated with calls from persons held on Rikers Island who want to report the conditions of their confinement, but regular jail calls are recorded and are thus not conducive to privileged conversations. In some instances, guards stand near detained persons while they speak on privileged calls, disincentivizing reporting of these issues. Staff has even started turning off the phone system altogether after an incident occurs, preventing those in custody from calling the City's 311 service, their loved ones, or their attorneys to report what happened.

165.     For those trying to reach their defense attorneys while awaiting trial, these waits substantially interfere with the detained person's right to communicate with counsel and support their own criminal defense. Criminal court typically requires an appearance every 2 to 6 weeks, but those housed on Rikers are missing approximately one third of their court dates, evidencing the widespread and pervasive denial of access to the courts for those detained on the Island.

---

[105] *See* Reuven Blau, "Justice Delayed: City Jail Staff Shortage Keeps Detainees From Getting to Court," The City (Sept. 14, 2021), https://www.thecity.nyc/2021/9/14/22674823/nyc-rikers-jail-staff-shortage-keeps-detainees-from-court.

166.    Worse still, going to court is the only real way to permanently leave Rikers Island, as a criminal defendant may only enter plea, be granted bail reduction, or proceed to trial by attending court. Thus, the City and DOC's widespread failure to provide timely and regular access to the court system is essentially denying detained persons a way off the Island, and forces them to endure the abhorrent conditions on the Island for even longer than necessary.

### H.  The Department of Correction is experiencing a staffing crisis caused by years of mismanagement and poor policymaking by the City.

167.    Current DOC Commissioner Louis Molina recently admitted that his agency's security practices "are deeply flawed . . . and illogical even to those with no law enforcement experience," and that "inadequate supervision at the facility level" has created dysfunction throughout the system.[106]

168.    The current staffing practices—the result of years of mismanagement, antiquated tracking systems, increasing absenteeism, and an overreliance on uniformed officers who lack effective leadership—serve as a stark example of the City's indifference and resistance to reform.

169.    In reality, the DOC employs more than sufficient staff,[107] but cannot effectively manage or control them.[108]

170.    The antiquated ways in which the City manages its correctional staff are well documented by the court-appointed federal monitor assigned to Rikers Island.[109] The Board of Correction and the *Nunez* monitor have urged DOC to create a modern system to deploy staff, as

---

[106] Conference Transcript at 25, *Nunez*, 11 Cv. 5845 (S.D.N.Y. April 26, 2022).

[107] *See* Lauren Gill et al., "Hundreds of New City Jail Officers for Rikers Put Detainee Advocates on Guard," The City (Jul. 11, 2021), https://www.thecity.nyc/2021/7/11/22572991/rikers-island-getting-more-jail-guards-correction-officers (reporting that the DOC employs a number of guards per detainee at a rate seven times higher than the national average).

[108] Jan Ransom and Pallaro, Bianca, "Behind the Violence at Rikers, Decades of Mismanagement and Dysfunction," The New York Times (Dec. 31, 2021), available at https://www.nytimes.com/ 2021/12/31/nyregion/rikers-island-correction-officers.html.

[109] Consent Judgment, *Nunez*, No. 11 cv 5845 (S.D.N.Y. Oct. 21, 2015), ECF No. 249.

DOC "does not utilize roster management software to manage daily staff assignments, which is particularly concerning given the size of the agency and the individual facilities and the number of modifications required." [110]

171.    As a result, "[d]aily shift schedules are modified by hand-written notes and [are] manually manipulated. Facility rosters are disorganized, are constantly adjusted and are difficult to decipher."[111] This outdated and inefficient system makes it "extremely difficult, if not impossible, to clearly track where all scheduled staff [are] assigned."[112]

172.    Commissioner Molina has criticized his agencies policies directly, stating that "[s]taffing practices and procedures do not allow [the DOC] to be effective operationally." Molina observed that there is "no accountability in a number of areas" pertaining to staff misconduct, and that the City and its DOC leadership have "created an environment where the discipline needed to operate a law enforcement agency [i]s absent."[113] The City has known about these issues for years, but has not reworked its policies to encourage existing staff to attend work regularly or perform their roles effectively, or hold accountable those who do not.

173.    Notwithstanding the 2015 consent decree in *Nunez et al. v. City of New York et al.*, Case No. 11 Civ. 5845 (LTS)(JCF), or its group of court-appointed monitors who have made dozens of solution-oriented recommendations concerning these issues (particularly concerning the deeply ingrained culture of violence promulgated by DOC officers), the City, DOC, and most recently Commissioner Molina, have failed to adequately screen, train, supervise, or discipline their officers for misconduct; have failed to ensure that their employees show up to work (or are

---

[110] Special Report of the *Nunez* Independent Monitor at ¶12, *Nunez*, No. 11 cv 5845 (S.D.N.Y. Mar. 16, 2022), ECF No. 438.
[111] *Id.*
[112] *Id.*
[113] Conference Transcript at 26, *Nunez*, No. 11 cv 5845 (S.D.N.Y. Apr. 26, 2022), ECF No. 456.

at least disciplined for excessive absences); and have failed to repair the broken staffing system to ensure that those who attend their shifts end up assigned to posts where they are most needed.

174.     The City has known about these issues for years but has not reworked its policies to encourage existing staff to attend work regularly or perform their roles effectively or hold accountable those who do not.

175.     Put simply, if the City of New York, its politicians, police, and the City's district attorneys insist on detaining thousands of people pretrial or on parole holds (some for extraordinary amounts of time), then the City must also ensure that there are enough well-trained correction officers in the posts where they are needed, ready and capable of doing their job.

176.     Part of the cause of the abhorrent conditions on Rikers Island is the City's poor leadership and persistent failures to adequately screen correction officers before they are hired; to properly train employed officers on how to keep incarcerated individuals safe and ensure that they receive the care and services to which they are constitutionally entitled; and to effectively manage, supervise, and discipline officers after their initial employment with the agency.

177.     With staff absenteeism on the rise since at least 2018, the City's pervasive failures to train and supervise staff are laid bare. DOC employees on the Island are ill equipped to handle the sheer numbers of detained persons or the deteriorating physical conditions.

178.     In May 2021, the federal monitor appointed in *Nunez et al. v. City of New York et al.*, Case No. 11 Civ. 5845 (LTS)(JCF), published his eleventh report, which found three overarching issues hindering much-needed progress on Rikers Island—all of which related to poor leadership and improper staffing:

> First, the poor quality of Facility leadership hinders progress and must be addressed
> for the Agency to ever become successful. Second, the dysfunctional deployment
> and overstaffing of certain posts in the Facilities must be reevaluated to ascertain
> whether resources are properly assigned and whether the Staff assigned to each post

actually meet their responsibilities consistently, without simply outsourcing the issue to a different group of Staff. Finally, the Department must have the ability to hold Staff accountable closer in time to the incident when they are not meeting their responsibilities and when misconduct occurs.[17]

179.    A Department of Investigation ("DOI") inquiry in 2015 also found that the process for hiring DOC staff was inconsistent and dangerous; historically, potential hires were not screened for gang affiliations, and at least one-third of applicants who were hired during the investigatory period should have been disqualified or subjected to further screening, either because they had criminal records, were previously rejected from employment by other law enforcement agencies, had serious psychological diagnoses that could affect their job performance, or had relatives detained on the Island, creating potential security risks.[114]

180.    These practices quickly led to the employment of persons closely associated with gangs,[115] persons with violent criminal records, and at least one person who was found to be psychologically unfit for duty but was nonetheless hired because of her friendship with union leadership.[116]

181.    More recently, DOC officers were caught coordinating with gangs to bring drugs and other contraband into the City's jails in exchange for cash payments, fueling violence and substance abuse on the Island,[117] and at least six correction officers were charged with federal crimes in January 2022 for their alleged connections to the criminal enterprise, which DOI Commissioner Margaret M. Garett identified as part of a pattern of "contraband-smuggling

---

[114] *See* Mark G. Peters, Commissioner, *New York City Department of Investigation Report on the Recruiting and Hiring Process for New York City Correction Officers*, (Jan. 2015), https://www1.nyc.gov/assets/doi/press-releases/2015/jan/pr01rikers_aiu_011515.pdf.

[115] *See* Liam Stack, *2 Rikers Guards Set Up Attack on Inmate, Officials Say*, N.Y. Times (Sept. 17, 2015), https://www.nytimes.com/2015/09/18/nyregion/2-rikers-guards-set-up-attack-on-inmate-officials-say.html.

[116] *See* Michael Schwirtz and Michael Winerip, *Warning Signs Overlooked in Hiring for New York City Jails*, N.Y. Times (Jan. 15, 2015), https://www.nytimes.com/2015/01/15/nyregion/hired-for-new-york-jails-despite-warning-signs.html.

[117] *See* Associated Press, *Rikers guards accused of smuggling contraband to gang members*, ABC News 10 (Apr. 6, 2022), https://www.news10.com/news/ny-news/rikers-guards-accused-of-smuggling-contraband-to-gang-members/.

conspiracies [that] have long plagued City jail facilities."[118]

182.    Exacerbating these hiring and oversight deficiencies is an overall lack of effective training. In 2016, former Mayor Bill de Blasio and corrections union leaders agreed that the small storefront in Queens used by the DOC to train its officers was insufficient to accomplish the agency's training goals, adding that a new facility should have been built 5 or 10 years earlier.[119]

183.    On August 6, 2021, the DOC—who had not addressed the issue of a new training facility in the five years following de Blasio's statement that the project was *already* 5 to 10 years behind—issued a press release wherein it admitted that "New York City has long needed a modern academy designed around best correctional training practices."[120]

184.    Almost a year later, the City has not even started construction on a new academy, and the expected completion of the academy is not until 2027— the same year the City expects to close Rikers. In the meantime, Rikers remains open, staff remain inadequately trained, and avoidable incidents occur every day on the Island as a result.

185.    The DOC itself can identify enormous gaps in its training: Only about 6 percent of correction officers have taken a yearly refresher course in suicide prevention (which is required of all 8,200 officers), and only 17 percent of uniformed staff which is required to take a mandatory fire safety course have completed the training, according to a spokesman for the agency.[121] This

---

[118] Press Release, "Six New York City Correction Officers and 15 Others Charged with Conspiring to Accept Bribes and Smuggle Contraband into Rikers Island Facilities" U.S. Attorney's Office for the Eastern District of New York (Jan. 14 2020), https://www.justice.gov/usao-edny/pr/six-new-york-city-correction-officers-and-15-others-charged-conspiring-accept-bribes.

[119] *See* Jillian Jorgensen, "Rikers Island Will Have More Officers Than Inmates Under Proposed Budget," Observer (January 21, 2016), https://observer.com/2016/01/rikers-island-will-have-more-officers-than-inmates-under-proposed-budget/.

[120] *See* Press Release, "City Identifies Site for New Correction Academy," New York City Department of Correction (Aug. 6, 2021), https://www1.nyc.gov/site/doc/media/new_correction _academy.page.

[121] *See* Chelsia Rose Marcius, "NYC Correction Dept. failing to give staffers up-to-date training in suicide prevention, fire safety as required," New York Daily News (Apr. 18, 2021), https://www.nydailynews.com/new-york/ny-correction-department-training-suicide-prevention-fire-safety-rikers-island-20210418-mqzfxnwowfhz7a6odazue2smla-story.html.

lack of training is shocking given that, as early as 2014, the former mayor acknowledged that the City has serious problems with training related to the mental health of detained persons within its care.[122]

186.    These improperly and inadequately trained officers are also severely mismanaged. The DOC allocates approximately 86 percent of its $2.6 billion budget to staffing[123]—more than its budget for programming and all other services for incarcerated individuals—despite the fact that the ratio of correction officers to incarcerated people in New York City is significantly higher than jails in the rest of the country:[124]



**Figure 4: Ratio of incarcerated people to corrections staff, NYC vs. United States**

1.  In 2020, the incarcerated person-to-corrections officer ratio was 3:5 in New York City.[17]
2.  In 2012, the incarcerated person-to-corrections officer ratio was 7:5 in New York City.
3.  By comparison, in 2018, the national average for the incarcerated person-to-corrections officer ratio was 21:5.[18]
4.  In 2020, the DOC's uniformed staff headcount was 9,237.[19]

187.    Notwithstanding these massive resources, DOC staff are not effectively managed and those in charge do not properly allocate the funds that are available in the DOC's budget. In fact, the DOC's staff management system is so outdated that staffing assignments are tracked by

---

[122] *See* n.2, *supra*.
[123] *See* VERA Institute, "A Look Inside the New York City Correction Budget" (May 2021) at 4,
https://www.vera.org/downloads/publications/a-look-inside-the-new-york-city-correction-budget.pdf.
[124] *Id.* at 5.

hand, on index cards.[125] Inevitably, this antiquated system leads to staffing problems, such as assigning someone to a post where a uniformed officer is not needed, or understaffing other posts where officers are needed, forcing some to work multiple back-to-back shifts.

188.    Overall, "[t]he Department struggles to manage its large number of Staff productively, to deploy them effectively, to supervise them responsibly, and to elevate the base level of skill of its Staff."[126]

189.    This poor leadership and mismanagement, coupled with the deplorable conditions on Rikers Island, have made it difficult for the DOC to attract and ultimately keep well-qualified correction officers on the Island.

190.    For example, over the last several years, the DOC employed approximately 7,500 correction officers on Rikers Island (and hundreds more at other facilities). According to COBA President Benny Boscio Jr., the DOC lost 1,400 officers between 2019 and 2021,[127] in part due to the miserable workplace conditions.

191.    But hiring more uniformed officers is frequently associated with higher rates of violent and excessive uses of force against detained persons, and is often not a solution to disorder, especially in an era where the jail population is decreasing significantly.[128]

192.    Put simply, there are more than enough DOC staff on the City's payroll, but there is no way to make sure that they are placed where they are needed within each facility—a problem further complicated by rising absenteeism, which highlights these deep deficiencies in the DOC's

---

[125] *See* Katrina Vanden Heuvel, "Opinion: Closing Rikers Island is a matter of life and death," Washington Post (Oct. 5, 2021), https:// death-crisis/.www.washingtonpost.com/opinions/2021/10/05/rikers-island- death-crisis/.

[126] *See* n. 115, *supra*.

[127] *See* VERA Institute, "A Look Inside the New York City Correction Budget" (May 2021) at 6, available at https://www.vera.org/downloads/publications/a-look-inside-the-new-york-city-correction-budget.pdf.

[128] *See* Steve J. Martin, "Eleventh Monitor's Report: July 1, 2020–December 31, 2020," at 11–14 (May 5, 2021) (finding that the "staffing issue seems to be one of roster management and deployment versus insufficient numbers of Staff"), https://www1.nyc.gov/assets/doc/downloads/pdf/11th_Monitor Report.pdf.

staffing policies and practices.

193.    The overarching issue is one of corruption, poor leadership, and bad management. As Sarah Townsend, investigator for staff misconduct in the City's jails, recently stated:

> You see corruption in a lot of different places on Rikers Island. When I say corruption, I mean from both the union, which basically runs the place if you have a willing partner in the commissioner and mayor which you do now. But I also saw corruption with a lot of the officers and captains.[129]

194.    Ms. Townsend also stated that two of the biggest difficulties she faced in her role as an investigator were "the union and the structure of discipline in general."[130]

195.    The union's heavy influence on the City's operations is well known. In April 2020, COBA, filed a lawsuit against the City alleging that its member officers were working triple shifts—where officers must work for 24 hours straight. But the City did nothing to resolve the situation, even though it was obvious that officers who work for 24 hours in a row are working in a severely diminished capacity, are more likely to inflict violence, and less likely to perform necessary aspects of their jobs.

196.    The former mayor responded to these reports by admitting that "[t]here should never have been 24-hour shifts. This was a dumb managerial mistake. It's not going to be allowed going from this point on, ever." But instead, it got worse.

197.    By February of 2021, correction officers were at a breaking point. The officers were still regularly working 24 hours shifts and were even sleeping in the parking lot because they were too tired to drive home. The DOC used a legal maneuver to delay the lawsuit challenging these working conditions, allowing the agency to keep the extended shifts.[131]

---

[129] See JB Nicholas, "Former Rikers Watchdog: "This Whole Fucking Thing Is A Racket," Hellgate NYC (May 3, 2022), https://www.hellgatenyc.com/nycs-former-jails-investigator-identifies-top-problem-on-rikers-corruption/.
[130] Id.
[131] See Video: "I-Team: Correction Officers' Claims of Grueling 24-Hour Shifts," NBC New York (Feb. 15, 2021), https://www.nbcnewyork.com/news/local/i-team-correction-officers-claims-of-grueling-24-hour-shifts/2889988/

198.    In March of 2021, the news reports were even more dire, as officers were working double and triple shifts, without breaks for food or water. At that point, there had not been a new class of recruits for approximately two years.[132]

199.    In May of 2021, the lack of available, qualified officers led staff to put an entire facility of detained persons with severe mental illness on lockdown. At least 1,200 officers called out sick that day, and another 700 were considered "medically restricted."  Approximately 1,901 detained persons were forced to stay in their cells, without recreation or services, for at least 13 hours. There were at least 11 similar lockdowns on the Island over the past year.

200.    In June 2021, one officer reported that she "had not eaten or had a break from her post at a facility on Rikers Island in more than 16 hours. When a fight erupted . . . she was too tired to stop it . . . she had worked 15 24-hour shifts since the fall [and] started sleeping in her car . . . because she was too tired to drive home and often had to return in a matter of hours."[133]

201.    Currently, nearly one-third of COs are either not showing up to work or not available to work with incarcerated people. And on some days, almost half of the staff is missing. In May 2022, an incarcerated individual even stole a logbook to help document the utter lack of guards on the Island.[134] The same month, DOC correction officer committed suicide, which the union's president attributed to the officer's job at the DOC.[135]

---

[132] *See* Video: "Rikers Officers Claim They're Told to Work 24-Hour Shifts Without Breaks, Food Or Water," NBC New York (Mar. 24, 2021), https://www.nbcnewyork.com/news/rikers-officers-claim-theyre-told-to-work-24-hour-shifts-without-breaks-food-or-water/2962998/.

[133] *See* Jan Ransom, "Disorder and Chaos in N.Y.C. Jails as Pandemic Recedes," The New York Times (Pub. June 19, 2021, Updated Oct. 18, 2021), https://www.nytimes.com/2021 /06/19/nyregion/rikers-island-chaos-suicides.html.

[134] *See* Gabrielle Fonrouge, "Rikers inmate steals official log book—to complain about 'outrageous' lack of guards," New York Post (Jul. 26, 2021), https://nypost.com/2021/07/26/rikers-inmate-steals-log-book-to-complain-about-lack-of-guards/.

[135] Thomas Tracy, "NYC Correction Officer Jumps From Verrazzano Bridge, Dies By Suicide," New York Daily News (May 13, 2022), https://www.yahoo.com/news/amphtml/nyc-correction-officer-jumps-verrazano-181800489.html.

202.    Correction officers have become so angry with their situation on the Island that they have also started organizing "sick outs," where as many as 1 in 5 officers at a time were calling in sick, allegedly as a form of illegal strike, or possibly because the working conditions had actually made them sick. Either way, staffing problems have worsened. In July 2021, the DOC had a total of 8,800 uniformed staff members, but 1,600 were on sick leave, 1,400 were medically monitored and unable to work, and 2,200 simply did not come to work that month.[136]

203.    In July of 2021, there were reports that hundreds of correction officers were quitting the DOC altogether, calling it "the worst job in the world."[137] Many more officers were incapacitated by COVID-19, which has spread rampantly in the crowded jails.

204.    As abhorrent as these working conditions have become, it is the detained persons who suffer the most from the City's systemic failures. The obvious and only just solution is to stop sending people to Rikers Island and release or relocate those who are housed there. But the City and its law enforcement apparatus refuse to decarcerate the Island, so they must bear the cost of having properly trained staff, as well as the cost of adequately managing that staff and the facilities themselves and compensate the thousands of detained persons who have suffered as a result of these managerial failings.

205.    The staffing crisis at Rikers and the mismanagement of available employees leaves on-duty guards too exhausted to engage in their most basic duties. Tasks like distributing medication, separating detained persons by classification (an important security protocol), intervening in violent interactions, deescalating tensions between guards and detained persons,

---

[136] *See* Jacob Kay, "Correction officers call for better conditions at Rikers," Queens Daily Eagle (Aug. 16, 2021), https://queenseagle.com/all/corrections-officers-call-for-better-conditions-on-rikers.
[137] *See* Jack Newman, "'This is the worst job in the world': How hundreds of NYC correction officers have quit to join the NYPD after being forced to work back-to-back prison shifts," Daily Mail Online (Jul. 12, 2021), https://www.dailymail.co.uk/news/article-9780533/Hundreds-NYC-corrections-officers-quit-worst-job-world-join-NYPD.html.

escorting incarcerated persons to programming, court appearances, legal visits, or the medical unit, or maintaining basic hygienic and habitable conditions for those housed on the Island, have all fallen by the wayside.

**I.  Rikers has a pervasive culture of violence among its staff.**

206.    In 2013, a class action was brought in the Southern District of New York on behalf of all present and future persons incarcerated on Rikers Island. *See, generally*, *Nunez et al. v. City of New York et al.*, Case No. 11 Civ. 5845 (LTS)(JCF). The lawsuit alleged that the City, through its correction officers on Rikers Island, engaged in a pattern and practice of excessive force. The lawsuit sought declaratory and injunctive relief on behalf of those effected by this *de facto* policy.

207.    In 2014, while the *Nunez* litigation was ongoing, former Mayor Bill DeBlasio hosted a roundtable to discuss much-needed reforms to Rikers Island, calling the multi-jail complex a "dehumanizing environment" which creates a "dynamic of conflict and violence" which was "decades in the making."[138]

208.    This round table—one of many public meetings on Rikers that would be held over the next five years—followed a Department of Justice report on the conditions of confinement for adolescent males on Rikers Island (herein after the "DOJ Report"). The DOJ Report, announced on August 4, 2014, concluded that "there is a pattern and practice of conduct at Rikers that violates the constitutional rights of adolescent inmates" and the "investigation suggests that the systemic deficiencies identified in [the] report may exist in equal measure" for adult detained persons housed in separate facilities on the Island.[139]

---

[138] *See* Office of the Mayor, "Mayor de Blasio Hosts Media Roundtable on Reform at Rikers Island Correctional Facilities," The City of New York (Nov. 20, 2014), https://www1.nyc.gov/office-of-the-mayor/news/932-14/transcript-mayor-de-blasio-hosts-media-roundtable-reform-rikers-island-correctional.

[139] *See* U.S. Department of Justice, "CRIPA Investigation of the New York City Department of Correction Jails on Rikers Island," (Aug. 4 2014), https://www.justice.gov/sites/default/files/usao-dny/legacy/2015/03/25/SDNYpercent20Rikers percent20Report.pdf.

209.    On October 21, 2015, the District Court entered a Consent Judgment in Nunez "to correct the violations of federal rights as alleged" by the Plaintiff class in that case. The Consent Judgment provided for a federal monitor to report on the DOC's compliance with the agreed-upon reforms for Rikers Island.

210.    Since the Consent Judgment was entered nearly seven years ago, federal monitor Steve J. Martin has produced at least twelve reports covering the period between October 22, 2015 (beginning the first monitoring period) and June 30, 2021 (ending the twelfth monitoring period); at least four Remedial Reports; and at least seventeen supplementary status reports, recommendations, and action plans associated with conditions on the Island,[140] all of which make clear that the City has not only failed to comply with the terms of the Consent Judgment, but that conditions on Rikers have worsened significantly since the Consent Judgment was entered, reflecting a "pervasive level of disorder and chaos in the facilities" that extends far beyond the staff violence against adolescent males for which the monitor was first required.[141]

211.    The extent of officer-inflicted violence on the incarcerated population is reflected in the experiences of the punitive class members. As staff absenteeism worsens, the guards who remain on the Island are quick to use violent interventions that often escalate, rather than deescalate, incidents between detained persons or simple misunderstandings or arguments between staff and those held on Rikers Island.

212.    With fewer a guards posted in positions that deal directly with the incarcerated population, a small argument or incident often results in harsh responses from DOC staff. The indiscriminate use of pepper spray has become synonymous with the agency's Emergency

---

[140] *Id.*
[141] *See* Steve J. Martin, "Eleventh Monitor's Report: July 1, 2020–December 31, 2020" (May 5, 2021), https://www1.nyc.gov/assets/doc/downloads/pdf/11th_Monitor_Report.pdf.

Services Unit ("ESU"), who are well known by detained persons to use retaliatory and brutal excessive force rather than the minimum force necessary to maintain order and protect the incarcerated population.

### J.  The City has neglected Rikers Island in anticipation of closing it down.

213.    Less than two years after the *Nunez* Consent Judgment, the City announced a $30 million comprehensive plan to close and replace Rikers.[142] City officials claimed that the plan included "immediate steps to expand services and renovate facilities to ensure that those who work and are incarcerated in city jails have safe, humane conditions as quickly as possible."[143]

214.    While the plan made clear that the transition away from Rikers would be lengthy (at the time, the estimated year of completion was 2026), it did not provide a detailed account of how those who remained housed on Rikers Island for the remainder of its operational period would be provided with constitutional standards of care. And in 2015, Mayor de Blasio admitted that he underestimated how dysfunctional Rikers is and how much was required to fix it.[144]

215.    In the months and years that followed the decision to close Rikers, the Island's eight separate jail facilities have fallen into complete disrepair. The problem is so abysmal that the City does not even have the ability to execute and complete routine work orders.[145]

216.    The deteriorating physical conditions lead directly to violence because cell and

---

[142] *See* Office of the Mayor, "Mayor de Blasio Announces 'Smaller, Safer, Fairer: A Roadmap to Closing Rikers Island,'" The City of New York (Jun. 22, 2017), https://www1.nyc.gov/office-of-the-mayor/news/427-17/mayor-de-blasio-smaller-safer-fairer--roadmap-closing-rikers-island-

[143] *See* Office of the Mayor, "Mayor DeBlasio Announces 'Smaller, Safe, Fairer: A Roadmap to Closing Rikers Island,'" The City of New York (Jun. 22, 2017),  https://www1.nyc.gov/office-of-the-mayor/news/427-17/mayor-de-blasio-smaller-safer-fairer--roadmap-closing-rikers-island-.

[144] *See* Michael Winerip, "Even as Many Eyes Watch, Brutality at Rikers Island Persists," The New York Times (Feb. 21, 2015) https://www.nytimes.com/2015/02/22/nyregion/even-as-many-eyes-watch-brutality-at-rikers-island-persists.html.

[145] *See* Nicole N. Austin, "Report on Environmental Conditions: *Benjamin v. Brann*, 75 Civ. 3073 (LAP) Progress Report May-August 2021," Office of Compliance Consultants (October 27, 2021) at 30 ("As with the prior monitoring period, a review of the PHS and EHO inspection reports for the current monitoring period indicate numerous references to the lighting not being maintained, and where work orders have been submitted the conditions have remained unabated, necessitating the submission of additional work orders.")

dormitory doors often do not lock, allowing incarcerated people to be attacked at night and allowing others access to restricted areas of the facilities, diverting staff away from their posts.

217.    Whistleblowers and activists, along with City and State officials, have warned for years that the Island was at a breaking point, long before COVID-19 reached New York. Yet Rikers has so greatly deteriorated that local politicians have pled with Gov. Hochul and President Biden to intervene, even requesting that the federal government send in the National Guard to help restore some semblance of order. Zachary Carter, former NYC Corporation Counsel and former US Attorney for New York's Eastern District, supported the idea of a federal receivership.[146]

218.    In addition to the multitude of requirements imposed by the original *Nunez* consent judgment, most of which continue to be ignored by City officials, District Court Judge Swain recently entered a sweeping order to help alleviate some of the concerns about worsening conditions on the Island.[147] There have been no signs of such implementation thus far.

219.    The City has violated multiple other court orders. For example, the City has not complied with the Environmental Order in *Benjamin* directing the DOC to remedy violations of federal law at Rikers.[148]

220.     In late September 2021, Judge Mitchell J. Danzinger of the Supreme Court, Bronx County, issued a preliminary injunction related to the inhumane conditions in a specific unit inside GRVC called the Enhanced Supervision Housing ("ESH").[149] The unit holds approximately 115 detained persons who the DOC believes pose a threat to themselves or others.

221.    The comprehensive preliminary injunction directed the DOC to provide basic

---

[146] *See* Stephen Handelman, "Reformers Call for Federal Takeover of New Yorks Rikers Jail," Center on Media Crime and Justice at John Jay College (May 20, 2022), https://thecrimereport.org/2022/ 05/20/reformers-call-for-federal-takeover-of-new-yorks-rikers-jail/.
[147] *See Nunez*, 11 cv 5845 at ECF No. 398.
[148] *See Benjamin v. Brann*, No. 75 cv 03073 (S.D.N.Y.).
[149] *See Acre et al v. City of New York, et al*, Index No. 809252/2021 (Sup. Ct. Bronx Co. 2021).

standards of living—access to showers and personal care items, bedding, clean blankets, recreational periods, access to attorneys and the courts, and three hot meals a day. The City continues to violate the injunctive order.

222.    At least one other lawsuit was recently brought by local defender organizations on behalf of those detained persons still trapped on the Island, specifically complaining of the lack of medical care accessible to those who need it.[150] The defendants were ordered to provide medical visits to everyone who needed it, but the City violated those orders and was held in contempt.[151]

223.    Either the City has let Rikers Island deteriorate so badly that it cannot comply with court orders, or the City is making a deliberate choice not to correct the problems, choosing contempt of court rather than taking the steps it needs to take.

224.    Either way, these contempt rulings, taken with the numerous admissions by DOC officials and politicians, make the situation undeniable. The City has simply failed, repeatedly and deliberately, to detain people in such a way that conditions meet bare minimum standards required both by the constitution and by simple human decency.

225.    The direct and inevitable result of the City of New York's policies are the multiple deprivations of Mr. Ramos' constitutional rights. The driving force behind every horrible condition at Rikers Island is a combination of the failure to properly staff the jails, the failure to train the people working there, and the failure to keep the jails in proper working order. Put simply, the City, in allowing Rikers Island to fall apart, caused Mr. Ramos' suffering and constitutional violations. Mr. Ramos was deprived of the minimal civilized measure of life's necessities and subjected to unreasonable health and safety risks and physical harm by DOC staff.

---

[150] *Id.*
[151] *See* Graham Raymon, "Bronx judge finds city in contempt for missed medical visits on Rikers Island," New York Daily News (Apr. 18, 2021), https://www.nydailynews.com/new-york/ny-rikers-contempt-order-judge-missed-medical-appointees-20220517-l5furejuw5eo3nshwmgfqyonqa story.html

226.    As a result, the City of New York is liable for any damages caused, except for punitive damages.

## THIRD CLAIM FOR RELIEF:
## STATE LAW CONSTITUTIONAL VIOLATIONS AND NEGLIGENCE AGAINST THE CITY OF NEW YORK

227.    Plaintiff realleges and incorporates by reference the allegations set forth in the foregoing paragraphs as if set forth herein.

228.    Such conduct breached the protections guaranteed to Plaintiff by the New York State Constitution, including but not limited to, Article 1, §§ 1 and 6.

229.    Employees of the City of New York and the DOC created and allowed to continue horrific conditions that deprived detainees and Plaintiff of the minimal civilized measure of life's necessities and subjected them to unreasonable health and safety risks. Plaintiff was furthermore subjected to unreasonable physical harm by DOC employees without just cause.

230.    These employees of the City of New York and DOC were negligent in allowing the aforementioned conditions to be created and persist.

231.    The City of New York is liable for the actions of DOC and its employees through the doctrine of *respondeat superior*.

232.    Violations of the state constitution are actionable because under 42 U.S.C. § 1983 there is no *respondeat superior* liability and no punitive damages, and thus the federal claims are not a sufficient replacement for the state constitutional claims.

## FOURTH CLAIM FOR RELIEF:
## BATTERY AGAINST THE INDIVIDUAL DEFENDANTS
## AND THE CITY OF NEW YORK

233. Plaintiff repeats, reiterates, and re-alleges each and every allegation contained in the above paragraphs with the same force and effect as if fully set forth herein.

234. The Individual Defendants intentionally, willfully and maliciously battered Plaintiff, when they, in a hostile and/or offensive manner struck Plaintiff and handcuffed him without his consent and with the intention of causing harmful and/or offensive bodily contact to the Plaintiff and caused such battery.

235. As a result of the above tortious conduct, Plaintiff was caused to suffer physical, economic, and emotional injuries, as well as a deprivation of liberty.

236. As a result of the above tortious conduct, the Individual Defendants are liable for punitive damages.

237. The City of New York is liable for the conduct of the Individual Defendants and any damages they caused under the doctrine of *respondeat superior*.

**WHEREFORE**, Plaintiff demands the following relief jointly and severally against all of the Individual Defendants, as well as the City of New York:

    a. Compensatory damages;

    b. Punitive damages;

    c. The convening and empaneling of a jury to consider the merits of the claims herein;

    d. Costs and interest and attorney's fees;

    e. Such other and further relief as this court may deem appropriate and equitable.

Dated: New York, New York
February 21, 2023

Rickner PLLC

By:            /s/

Rob Rickner
Sara Wolkensdorfer

14 Wall Street, Suite 1603
New York, New York 10005
Phone: (212) 300-6506
Fax: (888) 390-5401
*Attorney for Plaintiff*